USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/27/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MERLIN MENDEZ,

        Plaintiff,

        -against-

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

15-CV-08017 (VSB) (BCM)

**REPORT AND RECOMMENDATION
TO THE HON. VERNON S.
BRODERICK**

**BARBARA MOSES, United States Magistrate Judge.**

    Plaintiff Merlin Mendez brings this action pursuant to §§ 205(g) and 1631(c)(3) of the

Social Security Act (the Act), 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a final

determination of the Commissioner of Social Security (the Commissioner) denying his

application for Supplemental Security Income (SSI). Mendez moves for judgment on the

pleadings, pursuant to Fed. R. Civ. P. 12(c), reversing or remanding the Commissioner's

determination. The Commissioner cross-moves to uphold the determination. For the reasons set

forth below, I respectfully recommend that the Commissioner's motion be GRANTED and

plaintiff's motion be DENIED.

**I.    BACKGROUND**

**A. Procedural Background**

    Mendez applied for SSI on August 1, 2012, alleging that he had been disabled since July

2, 2007 due to bipolar disorder and depression. *See* Cert. Tr. of Record of Proceedings (Dkt. Nos.

12, 12-1-12-4), 150, 301 (hereinafter "R_"). His application was denied on October 24, 2012. (R.

14, 62.) Plaintiff requested a hearing, which took place before Administrative Law Judge (ALJ)

Seth Grossman on November 22, 2013. (R. 44-57.) During that hearing ALJ Grossman informed

plaintiff's counsel, "I'm sending your client out for a psychiatric examination," and "I'm

including an I.Q. test." (R. 52-53, 56.) On December 17, 2013, pyschologist Alan Dubro, Ph.D. performed the requested psychiatric and intellectual evaluations. (R. 424, 430.) A second hearing took place on June 10, 2014, at which ALJ Grossman heard testimony from medical expert Edward N. Halperin, M.D. and vocational expert Raymond E. Cestar. (R. 26-43.) Dr. Dubro did not appear. Neither did Mendez himself, although his counsel was present and agreed to proceed in his client's absence. (R. 41.)

On July 10, 2014, the ALJ denied the application. (R. 10, 14.) The decision became final on September 2, 2015, when the Appeals Council denied plaintiff's request for review of the ALJ's decision. (R. 1.) This action followed.

### B. Personal Background

Mendez was born on October 30, 1983. (R. 64.) According to his hearing testimony, he has a tenth-grade education and passed three parts of the GED exam. (R. 48-50.) He previously told Oneida Rodriguez, a social worker at Federation Employment and Guidance Services (FEGS),[1] that he completed welding and electrical training and received a certificate, but he could not recall when. (R. 187, 298.) On another occasion he reported that he held a commercial truck driver's license. (R. 226.) Mendez has an estimated full-scale I.Q. of 72, which is considered "borderline," and he reads at the sixth-grade level. (R. 33.)

Mendez testified that he lives alone in a one-bedroom apartment. (R. 50.) During the day he reads "a little," and when he has money he shops. (R. 51.) He has "a few" friends. *Id.* He would "love to" work. In fact, he told ALJ Grossman that if the ALJ hired him for a job, he

---

[1] FEGS was a New York City program that provided "assistance [for] applicants and recipients with complex clinical barriers to employment, including medical, mental health, and substance abuse conditions, to obtain employment or federal disability benefits." *Morales v. Colvin*, 2015 WL 2137776, at *7 n.16 (S.D.N.Y. May 4, 2015). FEGS assisted Mendez with his SSI application forms. (R. 186, 294.)

believed he would be able to do it. (R. 52.) When the ALJ asked him about the last time he worked, Mendez stated, "I do here and there." (R. 54.) Previously, however, Mendez told consultative psychologist Arlene Broska, Ph.D., that he "last worked as a dog walker five years ago for seven years" and "stopped working because he sold a dog and was fired." (R. 368.) On other occasions Mendez reported past employment as a cook at a fast food restaurant and as a part-time maintenance worker. (R. 188, 424.) He has also reported work in construction. (R. 227.) In 2012, however, he told a social worker that he had "no paid employment history." (R. 381.)

Mendez told Dr. Broska that he used to drink on a daily basis, and that he was admitted to an inpatient treatment program at Phoenix House for alcohol abuse in 2003 and 2004. (R. 368.) He reported that he stopped drinking in approximately 2006 (R. 368), when he was arrested for murder, manslaughter, and burglary, and was sentenced to two years in prison. (R. 369.) The record does not contain any criminal history or substance abuse treatment records. By October 2012, when he was examined by Dr. Broska, Mendez stated that he was not using alcohol or drugs. (R. 368.) In July 2012, he told a social worker at FEGS that he previously used marijuana daily, but had been clean of drugs for three years. (R. 383.)

## II.  PRE-HEARING EVIDENCE

### A.  Pre-Application Evidence

In January 2011, Mendez was evaluated by a physician, a social worker, and intake specialists at Bronx Lebanon Hospital through FEGS. The results of this evaluation are contained in a FEGS Biopsychosocial Report (BPS Report), which stated that Mendez lived alone and could travel independently by public transportation, but was unable to work because of his criminal record. (R. 221-46.) At that time Mendez reported to FEGS that he had been

3

incarcerated from the age of 16 through 2008. (R. 229.) Mendez also told Luz Rivera, a FEGS social worker, that he was registered for classes at the Global Institute. (R. 227.)

Mendez told Rivera that he was experiencing depressive symptoms and reported that he had been treated for depression in 2006, while he was incarcerated. (R. 231.) With respect to his daily activities, Mendez reported that he watched television, did chores, cooked meals, read, shopped, cared for his personal needs, and socialized daily. (R. 233-34.) Rivera noted that Mendez had "literacy issues with reading and writing." (R. 235, 338.) The examining physician, Dr. Sandhya Pattem, found that Mendez had a stable mood and affect. (R. 242.) Dr. Pattem diagnosed Mendez with depression and anger problems. (R. 246.)

On February 15, 2011, Mendez began treatment with a psychiatrist, Arcangelo Lubrano, M.D., at La Casa de Salud in the Bronx. At his first appointment, Mendez complained of poor sleep, thought blocking, inappropriate smiling, auditory hallucinations, and an inability to concentrate. (R. 354.) Dr. Lubrano diagnosed Mendez with schizoaffective disorder NOS and prescribed Abilify, Lexapro, and Lamictal. (R. 354.) Throughout 2011, Mendez regularly appeared for follow-up appointments with Dr. Lubrano, who continued his medications. (*See* R. 343, 349.) Dr. Lubrano's treatment notes from 2011 reflect that Mendez showed signs of "moderate improvement," and was "stable." (*See* R. 349, 343.)

On March 3, 2011, Mendez saw psychiatric nurse practitioner Romeeda Mohammed at La Casa de Salud. (R. 351.)[2] At that appointment, Mendez reported that he was going to school and "doing much better," *id.*, and he denied ongoing depression or psychotic symptoms. *Id.*

---

[2] Mohammed's electronic signature is followed by the initials "M.D." (R. 351.) However, her signature stamp on other documents reads "NP Psychiatry." (R. 286.) In addition, according to the New York State Office of the Professions, Mohammed is licensed as a nurse practitioner. *See* New York State Office of the Professions Verification Searches License Information, http://www.nysed.gov/coms/op001/opsc2a?profcd=10&plicno=163135&namechk=MOH  (last visited Feb. 24, 2017.)

4

Mohammed noted that plaintiff's appearance was appropriate and his thought content revealed no psychotic symptoms. Notwithstanding plaintiff's self-report of improvement, however, Mohammed noted that his behavior was overactive, he exhibited poor judgment, his mood/affect was flat, his speech was repetitive, and his thought processes were tangential. *Id.*

In her March 3, 2011 Treating Physician's Wellness Plan Report, Mohammed reported that Mendez was doing well on medication and was free from acute psychotic symptoms. (R. 285.) The diagnosis/condition that was the focus of Mendez's treatment – identified on the previous page as "Depression and Anger Problems" – had stabilized. (R. 285-86.) Mendez told Mohammed that he was unable to work because he wanted to go back to school and give himself time for his medication to take full effect. (R. 285.) Mohammed checked a box labeled "Temporarily Unemployable" and wrote that Mendez could return to work in three months. (R. 286.)

On May 25, 2011, Mendez saw Dale Dudley, M.D. at La Casa de Salud for a medication refill. (R. 345.) Dr. Dudley noted that Mendez requested a "letter to HRA [New York City Human Resources Administration] re employability." *Id.* Dr. Dudley found that Mendez had "good eye contact, normal speech, [was] alert" and exhibited "no thought disorder." *Id.* Dr. Dudley continued plaintiff's medications. *Id.*

Between June 29, 2012 and July 5, 2012, Mendez was again evaluated by FEGS, resulting in a second BPS Report. (R. 376.) According to that BPS Report, Mendez could wash dishes and clothes, sweep, mop, vacuum, watch television, make beds, shop for groceries, cook meals, read, socialize, get dressed, bathe, use the toilet, and groom himself. (R. 386.) However, he had "no paid employment history" and stated that "due to his mental health conditions he is unable to work at this time." (R. 381.) Mendez reported "severe depression" as his barrier to

5

employment. (R. 387.) However, in his "final" diagnosis, dated July 19, 2012, Jee Lee, M.D. listed "episodic mood disorders," and more specifically, "bipolar disorder." (R. 394-95.) The diagnosis was described as "current" and "unstable." (R. 394.) Under "Employment Disposition," Dr. Lee stated, "Substantial Functional Limitations to Employment Due to Medical Conditions That Will Last For At Least 12 Months and Make The Individual Unable To Work." (R. 394.)

### B. Post-Application Evidence

Dr. Broska conducted a consultative evaluation of Mendez on October 4, 2012. (R. 368-70.) Mendez told Dr. Broska that he had been treated for depression at Bellevue Hospital in 2003. (R. 368.) He also reported that he was seeing Dr. Lubrano once a month at La Casa de Salud, and that he took Abilify. *Id.* He did not mention any other medications. Mendez stated that his sleep and appetite were "normal" but that he "stays home a lot" and "feels sad" at times. *Id.* Dr. Broska noted that "[t]here have been times when he felt like he did not want to do anything" and "[t]here are times he has gotten nervous." *Id.*

Mendez reported to Dr. Broska that he was "able to dress, bathe, and groom himself." (R. 370.) Dr. Broska noted that Mendez "cooks and prepares food everyday [sic]. He cleans every day. He does laundry every day. He shops once a month and travels independently on public transportation. He is not socializing. He listens to the radio and goes to the library." *Id.* Dr. Broska opined that Mendez "will be able to manage his own funds." *Id.*

Dr. Broska observed that Mendez's "demeanor and responsiveness to questions was cooperative. His manner of relating, social skills, and overall presentation were adequate." (R. 369.) Regarding plaintiff's speech, Dr. Broska observed that his "[i]ntelligibility was fluent," his "quality of voice was clear," and his "[e]xpressive and receptive language abilities were adequate." *Id.* Mendez's thought processes were "[c]oherent and goal directed with no evidence

6

of hallucinations, delusions, or paranoia" and his affect was "[o]f full range and appropriate in speech and thought content." *Id.* His mood was "neutral," his sensorium was "clear," his attention and concentration were "intact," and his recent and remote memory skills were "[w]ithin normal limits." *Id.* However, his cognitive functioning was "below average" and his judgment and insight were both "poor." (R. 370.)

Dr. Broska concluded:

> Vocationally it appears the claimant can follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, and perform complex tasks independently. He may not always make appropriate decisions. He can relate adequately with others and appropriately deal with some stress. The results of the examination appear to be consistent with a history of substance abuse, but in itself [sic] does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis.

*Id.*

On July 23, 2013, Mendez returned to La Casa de Salud for an appointment with Dr. Lubrano, complaining of anxiety. (R. 442.) By that time, his medication regime consisted only of 10 mg of Abilify. *Id.* Dr. Lubrano noted that plaintiff was "stable on present regime," "pleasant, cooperative and well related," showed no signs of psychosis or mania, and did not report any side effects from his medications. *Id.* Dr. Lubrano characterized plaintiff's medication response as "moderate improvement." *Id.*

On September 10, 2013, Mendez took commercial driver license (CDL) paperwork to La Casa de Salud and underwent the physical exam necessary to apply for a CDL. (R. 443-46.) He had previously reported to FEGS that he received a truck driver's license in December 2011. (R. 226.) The record does not indicate whether plaintiff actually applied for or obtained a CDL.

On October 10, 2013, Mendez presented to Dr. Lubrano with bipolar disorder, described as a "continuation of initial symptoms." (R. 447.) Mendez reported that his functioning was

7

somewhat difficult, and he was experiencing "racing thoughts." *Id.* However, Dr. Lubrano noted that Mendez was pleasant, cooperative, and well related; was compliant with his medication; denied side effects from the medication, and was "not exhibiting signs of psychosis" or mania. *Id.* Dr. Lubrano continued to diagnose plaintiff with schizoaffective psychosis, and continued to characterize his medication response as "moderate improvement." *Id.*

That same day, Dr. Lubrano completed a Treating Physician's Wellness Plan Report for Mendez (R. 413-14), in which he identified plaintiff's current diagnoses as depression/bipolar disorder and schizoaffective psychosis. (R. 413.) Dr. Lubrano also noted that Mendez had a history of two prior psychiatric hospitalizations and suffered from poor sleep, thought blocking, auditory hallucinations, inappropriate smiling, crying spells, mood swings, and racing thoughts. *Id.* Dr. Lubrano indicated that Mendez was compliant with treatment, but had a "poor response to medication," and that his condition had not been resolved or stabilized. (R. 413-14.) Dr. Lubrano checked a box to indicate that Mendez would be "[u]nable to work for at least 12 months." (R. 414.)

## C. Post-Denial Evidence

On November 19, 2013, Mendez presented to Dr. Lubrano with depression. (R. 450.) In his notes, Dr. Lubrano stated, "There is improvement of initial symptoms. The patient had medication. Additional Information: Client remains stable on present regime, Oriented x3, pleasant, cooperative and well related. No evidence of delusions, hallucinations or suicidal ideations. Medications renewed, no side effects reported." *Id.*

That same day, Dr. Lubrano completed a Medical Source Statement and a Psychiatric Medical Report for Mendez in connection with his pending SSI application. (R. 414, 420.) In the Medical Source Statement, Dr. Lubrano checked boxes to indicate that Mendez had "moderate" limitations with respect to (i) understanding, remembering, and carrying out simple instructions,

8

and "extreme" limitations with respect to (ii) understanding and remembering complex instructions, (iii) carrying out complex instructions, and (iv) making judgments on complex work-related decisions. (R. 416.) With respect to making judgments on simple work-related decisions, Dr. Lubrano checked both the "moderate" and the "extreme" boxes. *Id.* Asked to identify the factors that supported his assessment, Dr. Lubrano left that section of the Medical Source Statement blank. *Id.*

On the next page, Dr. Lubrano checked additional boxes to indicate that plaintiff's interactions would be affected by his impairment; that he suffered from both "moderate" and "marked" limitations with respect to interacting appropriately with the public; and that he suffered from extreme limitations with respect to interacting appropriately with co-workers and responding appropriately to usual work situations and to changes in a routine work setting. (R. 417.) Dr. Lubrano also noted that Mendez had been unable to keep a job for more than two months in the past. *Id.* He did not provide any further detail concerning plaintiff's past employment.

In his Psychiatric Medical Report, Dr. Lubrano noted that Mendez had poor hygiene and grooming and inappropriate laughing. (R. 420.) He described plaintiff's speech, thought organization and thought content as "disorganized," with mood swings and racing thoughts. *Id.* Plaintiff's mood was "elated" and his affect was "inappropriate." (R. 421.) Mendez was unable to concentrate and stay on task, was disoriented as to day, had a poor memory, a fair fund of information, and exhibited poor insight and judgment. *Id.* Regarding Mendez's activities of daily living, Dr. Lubrano found that he was isolated and had poor social skills. (R. 422.) Dr. Lubrano also noted that Mendez had poor relations with his relatives. *Id.* In response to a question about plaintiff's ability to function in a work setting, Dr. Lubrano reported that he was unable to

9

concentrate and stay on task, had poor social skills, and was unable to follow even simple instructions. *Id.* However, according to Dr. Lubrano, Mendez was competent to handle any benefit payment. (R. 423.)

On June 2, 2014, Mendez presented to Dr. Lubrano with depression. (R. 453.) However, Dr. Lubrano reported, "This is a follow-up visit. There is improvement of initial symptoms. The patient reports functioning as somewhat difficult. The patient had medication." Dr. Lubrano continued, "Client remains stable on present medication. Oriented x3, pleasant, cooperative and well related. No evidence of delusions, hallucinations or suicidal ideations. Medications renewed, no side effects reported." *Id.*

## III.  HEARINGS

### A.  November 22, 2013 Hearing

The first hearing before ALJ Grossman was held on November 22, 2013, and lasted approximately 12 minutes. (R. 46-57.) Mendez appeared with counsel and testified that he was 30 years old, that he went to high school in New Jersey and reached "around tenth grade" (R. 49), and that he had taken "three tests" of the GED. (R. 48-49.) He did not testify that he had *obtained* his GED. Mendez confirmed that his treatment took place at La Casa de Salud and that he lived alone in a one-bedroom apartment. (R. 50.) He stated that he reads "a little," and shops when he has money. (R. 51.) He said he had a "few" friends and named two. *Id.*

When the ALJ asked if he could work, Mendez responded, "Absolutely. I would love to." (R. 52.) The ALJ then asked, "If I hired you for a job now, could you do it?" Mendez replied, "I believe so." *Id.* Apparently struck by this response, the ALJ continued:

> Why are we here? But I'm not doing that. Look, counselor, this is what I'm doing
> . . . I'm sending your client out for a psychiatric examination . . . Okay? And for
> no good reason, I'm including an I.Q. test . . . I'd have to say that it's more – I
> don't think that it has anything to do with any particular listing, but it's more

10

curiosity –

(R. 52-53.)

Before adjourning the hearing, ALJ Grossman continued to question Mendez, asking him if he ever heard voices or saw things that weren't there. Mendez replied that he did not, except "my dreams." (R. 53.) Shortly thereafter, the ALJ commented, "You seem stiff. You seem like you're – okay. No? I know you're capable here. You're putting your hands like – doing a jumping jack, but I know you're capable of it." (R. 54.)

The ALJ then inquired as to whether Mendez had tried to get a job recently. Mendez replied, "Recently? Recently, I – that's a tough question." (R. 54.) The ALJ asked when he last worked, and plaintiff replied, "The last time I worked? It was like – I do here and there – here and there, you know." *Id.* When the ALJ pressed him, Mendez stated, "I'm paranoid. I'm in front of a judge, you know? I like – I – I'm trying to speak. You know, it gets me nervous. I don't want to give you the wrong impression." (R. 55.) ALJ Grossman asked him what he meant by "paranoid," and Mendez stated, "I get paranoid when they ask me – I mean – ." *Id.*

The ALJ then moved to another subject, asking if Mendez had ever been arrested. Plaintiff had trouble recalling the date, offering, "2010. No, no. 2008. 2000 – this – ." (R. 55.) When asked if he had been in prison, Mendez replied, "Something like that." *Id.* When asked why he was in prison, and why he was arrested, Mendez appears to have been unable to answer, stating, "They arrested me for – I really don't – ." *Id.* At that point, the ALJ concluded the hearing, stating, "I think the – we're done for today." Plaintiff's counsel concurred, stating, "I think you developed a record well for now." *Id.* ALJ Grossman reminded Mendez, "we're sending you out for another psychiatric examination," and stated that at the next hearing "we will

11

have an in-person ME [medical examiner]." (R. 56.) The ALJ emphasized, "I want somebody who actually . . . looks at your client . . . in the eye." *Id.*

## B. Additional Evaluation by Dr. Dubro

On December 17, 2013, pursuant to the ALJ's direction, Mendez was evaluated by Dr. Dubro, who performed both a psychiatric evaluation and an intelligence evaluation, and prepared a Medical Source Statement of Ability to do Work-Related Activities (Mental). (R. 424, 430, 436.) Mendez told Dr. Dubro that he received special education services in school, that he did not complete high school, that he took the GED test but never passed it, and that he previously worked part-time as a maintenance worker. (R. 424, 430.) He informed the psychologist that he had been psychiatrically hospitalized twice in the past, for depression, most recently at Brooklyn Hospital three years ago (R. 424, 430), and that he had been incarcerated for three years, between 2006 and 2009. (R. 425, 430.)

In the psychiatric evaluation, Dr. Dubro noted that plaintiff took Abilify at bedtime, which helped him fall asleep, but he did not sleep through the night. (R. 424.) He experienced problems with anger control and impulse control. (R. 424-25.) As a result, Mendez acknowledged, he had gotten into a number of verbal and physical altercations, but Abilify helped him control those symptoms. (R. 425.) Plaintiff reported being easily distracted, easily bored, and overly talkative. *Id.*

Mendez was casually dressed and adequately groomed. (R. 425.) His motor behavior was restless and fidgety during the mental status examination, and he "attempted to answer questions before [Dr. Dubro] had finished asking them." *Id.* During the exam Mendez was able to establish, but not consistently maintain, eye contact. *Id.* Questions frequently needed to be repeated due to his difficulty concentrating. *Id.* Plaintiff's thought process was relatively circumstantial and tangential and he frequently needed to be redirected by Dr. Dubro. *Id.* He

12

denied experiencing any psychotic symptoms. (R. 426.) Mendez's affect was "full range," *id.*, but his mood was inappropriate to thought content. For example, "he would be discussing something serious (his being incarcerated) and would begin to laugh spontaneously." *Id.*

Dr. Dubro reported that Mendez "does get up and out of bed each day. He does maintain his hygiene on a regular basis. He is easily distracted and reports that he only prepares simple meals and does light cleaning at home. He does do his food shopping once per month and laundry once every other week. He did not report socializing with friends and has no contact with family members." (R. 426-27.)

Dr. Dubro diagnosed Mendez with bipolar disorder and learning disorder, as well as borderline intelligence. He specifically found that, "[g]iven problems with adequate judgment, the claimant will require assistance in managing money." (R. 428.)

In the intelligence evaluation, Dr. Dubro observed that "frequently questions needed to be repeated" for Mendez, but judged his attention span "adequate for testing purposes" and stated that "[e]motional factors were not seen as impacting on test performance." (R. 431.) After administering a standardized achievement measure known as the Wide Range Achievement Test, Dr. Dubro concluded that plaintiff's reading and decoding skills were at a sixth-grade level. *Id.* His full-scale I.Q. was 72. *Id.* Mendez performed in the "borderline range" on subtests assessing verbal reasoning, perceptual reasoning, and working verbal memory. (R. 432.) He performed in the "mild range" of intellectual disability on subtests that assessed perceptual processing speed and in the "low average range" on the subtest that assessed perceptual reasoning with a motor component. *Id.*

Both the psychiatric evaluation and the intelligence evaluation included the following

statement:

> The claimant can understand directions. The claimant displays moderate difficulty
> in his ability to attend, remember, and follow directions. The claimant's attention
> span and concentration is moderately impaired. The claimant is seen as an
> individual who would experience moderate difficulty in learning new tasks. The
> claimant displays moderate difficulty in his ability to perform daily tasks
> independently and on a regular basis. He does display marked difficulty in his
> ability to perform complex tasks independently and on a regular basis. He
> displays marked difficulty in his ability to interact with others. He does display,
> secondary to problems associated with adequate impulse control, marked
> difficulty in his ability to make day to day decisions. The claimant is seen as an
> individual who would display marked difficulty, secondary to learning and
> psychiatric problems, in his ability to regularly attend to a routine and maintain a
> schedule.
>
> The results of the examination are consistent with psychiatric and learning
> problems which significantly interfere with the claimant's ability to function on a
> daily basis.

(R. 427, 433.)

On the accompanying Medical Source Statement of Ability to do Work-Related

Activities (Mental), Dr. Dubro stated that Mendez's ability to understand, remember, and carry

out instructions was affected by his impairment. (R. 436.) Specifically, Dr. Dubro concluded,

Mendez has "mild" limitations with respect to understanding, remembering, and carrying out

simple instructions, "moderate" limitations with respect to his ability to make judgments on

simple work-related decisions, and "marked" limitations with respect to his ability to understand,

remember, and carry out complex instructions and make judgments on complex work-related

decisions. *Id.* In addition, Dr. Dubro found that plaintiff had "marked" limitations in his ability to

interact appropriately with supervision, coworkers, and the public and to respond to changes in

the routine work setting. (R. 437.)

14

## C. June 10, 2014 Hearing

Dr. Dubro did not appear at the June 10, 2014 hearing, which lasted approximately 20 minutes. (R. 28-42.) Neither did Mendez, though his counsel was present.[3] The ALJ took testimony from medical expert Dr. Halperin and telephonic testimony from vocational expert Cestar, neither of whom had ever met Mendez. (R. 32. 37.) Both experts based their testimony on their review of plaintiff's file. (R. 32, 37.)

At the outset of the hearing, the ALJ gave plaintiff's counsel "the opportunity to summarize [Mendez's] testimony from last time." (R. 28.) Counsel stated that Mendez "did not – truthfully, he did not testify in any coherent fashion in my opinion but he did testify as to the fact that he is unable to be around people, that he stresses out around people, that he – and my recollection is – I don't see it specifically in my notes, but my recollection is I asked him briefly about his ability to concentrate and he gave an answer that he can't – the hearing was cut short very quickly . . . I think it was like about a five-minute hearing if that." (R. 29.)[4] The ALJ recalled that Mendez had testified he gets "paranoid," and that he lives in a one-bedroom apartment by himself. *Id.* The ALJ added, "He has a GED I believe." *Id.*[5] The ALJ then reviewed portions of the hearing reporter's notes concerning Mendez's daily activities, nervousness before the ALJ, and criminal record. (R. 30-31.)

---

[3] Plaintiff's counsel explains, in his motion papers, that "plaintiff arrived about an hour late for the hearing because of problems attempting to get to the hearing without assistance. Plaintiff's counsel was unaware that plaintiff was attempting to get to the hearing and elected to proceed to accommodate the schedule of the medical expert." Pl. Mot. for J. on the Pleadings, dated Apr. 5, 2016 (Dkt. No. 14), at 3 n.3.

[4] In fact, the first hearing lasted 12 minutes. (R. 46-57.) The transcript does not reflect any testimony concerning plaintiff's ability to be around people or his ability to concentrate.

[5] As noted above, Mendez did not so testify at the first hearing. (R. 48-49.) There is no evidence in the record that Mendez ever obtained a GED.

15

Dr. Halperin then testified. Based on his review of the record, he stated that Mendez "is a man who tested out with a borderline I.Q., full scale of 72. However, he reads on [a] sixth grade level," which is "perfectly literate in terms of filling out job applications." (R. 33.) Dr. Halperin continued, "Apparently, he's worked as a maintenance person. He has difficulty controlling his temper, but he was placed on medication, Abilify 10 milligrams, and . . . was seen as doing reasonably well. There is some mention of the fact that he has at times memory difficulties and concentration [difficulties], although in the formal psychiatric [evaluation], it's not at a level that would preclude his working at a simple task and perhaps even a more complicated task." *Id.*

Dr. Halperin confirmed that his opinion was based on Dr. Lubrano's treatment notes from La Casa de Salud and "the two C.E.s," presumably meaning the consultative evaluations by Dr. Broska and Dr. Dubro. (R. 33.) Dr. Halperin opined that Mendez did not meet or equal any listing and that he would have only "slight" problems getting along with people in a job. (R. 34.) Dr. Halperin agreed with the ALJ that Mendez "could concentrate and keep a regular schedule and show up five days a week . . . on a basic, simple, unskilled job." *Id.*

Offered the opportunity to cross-examine Dr. Halperin, plaintiff's attorney provided "more of a summing-up" (R. 34), asking the ALJ to consider his client's failure to appear "as evidence of his ability or lack thereof to keep a schedule." (R. 35.) Counsel also noted that Dr. Halperin "hasn't had the chance to see him and the records are somewhat sparse." *Id.*

The ALJ then took testimony from the vocational expert. Cestar stated that plaintiff's "PRW" (past relevant work) included "fast food cook" and "cleaner/maintenance." (R. 37.) ALJ Grossman asked Cestar whether a hypothetical claimant with plaintiff's "educational and vocational background who is limited to simple instruction task job[s] and at most occasional contact with supervisors, the public, and coworkers" could do those jobs. (R. 38.) Cestar testified

that such a person could be a cleaner. *Id.* The ALJ asked Cestar to name three additional jobs that the hypothetical person could do, and the expert responded with "kitchen helper" (nationally, approximately 274,000 jobs), "laborer, stores" (nationally, approximately 61,000 jobs), and a "[p]ark worker" (nationally, approximately 43,000 jobs). (R. 38-39.)

The ALJ then turned back to Dr. Halperin and asked if Mendez had bipolar disorder. (R. 41.) Dr. Halperin said he would "want to have more evidence" on that issue. *Id.* ALJ Grossman then noted that although Mendez had borderline intelligence, his "[s]ixth grade reading level is not all that bad" and "he has a GED." (R. 42.) Plaintiff's counsel did not correct this remark. After confirming that counsel could "do without [his] client," *id.*, the ALJ closed the hearing.

## IV.   ALJ DECISION

### A.  Standards

In his July 10, 2014 written decision (R. 14), ALJ Grossman correctly set out the five-step sequential evaluation process used pursuant to 20 C.F.R. § 416.920(a) to determine whether a claimant over the age of 18 is disabled within the meaning of the Act. (R. 15-16.) The Second Circuit has described the sequence as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1 . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not

progress to the next step. 20 C.F.R. § 416.920(a)(4). A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the fifth step. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Therefore, to support a finding that the claimant is not disabled at step five, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local economies that the claimant can perform, given the claimant's residual functional capacity (RFC), age, education, and past relevant work experience. *See* 20 C.F.R. §§ 416.912(f), 416.960(c).

The regulations as they existed at the time of the Commissioner's decision provide further guidance for evaluating whether a mental impairment meets or equals a listed impairment under the third step. In a "complex and highly individualized process," 20 C.F.R. § 416.920a(c)(1), the ALJ must determine how the impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 416.920a(c)(2). The main areas that are assessed are the claimant's (i) activities of daily living; (ii) social functioning; (iii) concentration, persistence, or pace; and (iv) episodes of decompensation. The first three categories are rated on a five-point scale from "none," through "mild," "moderate," "marked," and "extreme." 20 C.F.R. § 416.920a(c)(4). A "marked" limitation "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively and on a sustained basis." 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.00(c). The last area – episodes of decompensation – is rated on a four-point scale: none, one or two, three, and four or more. 20 C.F.R. § 416.920a(c)(4).[6]

_____

[6] As of January 17, 2017, the text of 20 C.F.R. § 416.920a (c)(3) and (c)(4) has been amended to read, "(3) We have identified four broad functional areas in which we will rate the degree of your

18

Furthermore, with respect to listed mental disorders, including affective disorders, a claimant must show in part that he has at least two of the so-called "paragraph B criteria" or "paragraph C criteria." The paragraph B criteria require at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(B).[7] The paragraph C criteria require (1) repeated episodes of decompensation, each for extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(C).

If the mental disorder does not qualify as a listed impairment under the standards, it may still qualify as a disability if the claimant's RFC does not allow him to perform the requirements of his past relevant work, or if the claimant's limitations, age, education, and work experience dictate that he cannot be expected to do any other work in the national economy. 20 C.F.R. § 416.920(e). The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical evidence,

---

functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself . . . (4) When we rate your degree of limitation in these areas . . ., we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity."

[7] As of January 17, 2017, the text of 20 C.F.R. Pt. 404, subpt. P, app'x 1 §§ 12.00 and 12.04 has also been amended. The Court applies the regulations as they existed at the time of the Commissioner's decision.

and medical opinions from treating and consulting sources. 20 C.F.R. §§ 416.920(e), 416.945(a)(3).

Finally, the Commissioner is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy" that the claimant can do, given his RFC. 20 C.F.R. § 416.960(c)(2). The Medical-Vocational Guidelines (commonly referred to as the "Grids"), 20 C.F.R. Pt. 404, Subpt. P, app'x 2, typically guide this evaluation, placing claimants with exertional limitations into categories according to their RFC, age, education, and work experience. *See* 20 C.F.R. § 416.920(f). However, "[u]nder the law of this Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden." *Lacava v. Astrue*, 2012 WL 6621731, at \*18 (S.D.N.Y. Nov. 27, 2012) (citations omitted), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

## B. Application of Standards

ALJ Grossman found that Mendez "has not been under a disability within the meaning of the Social Security Act since August 1, 2012," which is the date his application was filed. (R. 14, 22.) In making his determination, the ALJ "considered the complete medical history consistent with 20 C.F.R. 416.912(d)." (R. 14.)

At step one, the ALJ found that Mendez had not engaged in substantial gainful activity since filing his SSI application. (R. 16.)

At step two, the ALJ found that Mendez suffered from "severe" impairments, including schizoaffective disorder, bipolar disorder, and borderline intellectual functioning. (R. 16.)

At step three, the ALJ found that Mendez's impairments did not meet or medically equal the severity of one of the listed impairments. (R. 16.) The ALJ identified the relevant listing as 12.04 (depressive, bipolar, and related disorders), and explained that his finding was supported

20

by the testimony of the medical expert, Dr. Halperin. *Id*. In assessing the "paragraph B" criteria, the ALJ found that Mendez has only "mild" restrictions in activities of daily living, "moderate" restrictions in social functioning, and "moderate" difficulties with regard to concentration, persistence, or pace. (R. 17.) In reaching these conclusions, the ALJ reviewed various parts of the record, including the June 2012 FEGS evaluation, Dr. Lubrano's treating notes and reports, and the reports of both consultative examiners. *Id.* The ALJ further found that Mendez had not experienced any episodes of decompensation of extended duration within the relevant time period. *Id.* "Because the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limited and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied." *Id*. In addition, the ALJ found that the "paragraph C" criteria were not met because Mendez did not live in a highly supportive environment. (R. 18.)

At step four, ALJ Grosssman concluded that Mendez had the residual functional capacity to perform a full range of work subject to "the following nonexertional limitations: simple task/instruction jobs with at most occasional contact with supervisors, coworkers, and the public." (R. 18.) In making this finding, the ALJ considered the opinions of medical expert Dr. Halperin, the two consultative examiners, and plaintiff's treating psychiatrist. (R. 20.) He concluded that Mendez has "some limitations, but not to the extent that would prevent all work." *Id*. To support his finding that plaintiff's statements regarding the severity of his symptoms were not entirely credible, the ALJ relied on plaintiff's testimony at the first hearing, noting (incorrectly) that Mendez "stated that he has a GED," and (correctly) that Mendez "stated that he thinks he is able to work and has no auditory hallucinations." *Id*. The ALJ also noted that plaintiff "was seeking a commercial driver's license during the period at issue." *Id*.

21

The ALJ gave "significant weight" to Dr. Halperin's opinion, because Dr. Halperin "reviewed all available evidence and gave detailed testimony," and "little weight" to Dr. Lubrano's opinion, because it was undermined in part by his own treatment notes. (R. 20.) The ALJ provided specific examples, contrasting Dr. Lubrano's November 19, 2013 report, which stated that Mendez "had poor hygiene and grooming, inappropriate laughing, poor social functioning, and disorganized thoughts," with his treatment notes from the same date, which described Mendez as "pleasant, cooperative, well-related, and stable." *Id.* The ALJ gave "some weight" to the opinions of the two consultative examiners, "as they are supported by clinical findings." *Id.*

At step five, the ALJ found that Mendez is capable of performing his past relevant work as a cleaner/maintenance person because that job does not require the performance of work-related activities precluded by his RFC. (R. 20.) In reaching this conclusion, the ALJ relied primarily on the testimony of vocational expert Cestar. (R. 21.) The ALJ also made an alternative finding that other jobs exist in significant numbers in the national economy that Mendez could perform, including kitchen helper; laborer, stores; and park worker. *Id.*

## V. ANALYSIS

The primary issue for this Court is whether the ALJ properly gave "little" weight to the opinion of plaintiff's treating physician Dr. Lubrano, while giving "significant" weight to the opinion of Dr. Halperin, who never met Mendez, and "some" weight to the opinions of the consultative examiners. (R. 20.) Mendez argues that the ALJ violated the treating physician rule, which requires him to give controlling weight to the opinion of a claimant's treating physician as long as that opinion is well-supported by medical findings and is not inconsistent with other evidence in the record. 20 C.F.R. § 416.927(c)(2). *See* Pl. Mem. of Law, dated Apr. 5, 2016

22

(Dkt. No. 15), at 1-10. The Commissioner argues that substantial evidence supports the conclusion that Mendez was not disabled, and that the ALJ did not err in giving little weight to Dr. Lubrano's opinion because his opinion was inconsistent with his treatment notes and other evidence in the record. *See* Def. Mem. of Law, filed Apr. 14, 2016 (Dkt. No. 17), at 14-21.

## A. Substantial Evidence

A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995). Thus, if there is sufficient evidence to support the final decision, the court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. *See Brault v. Comm'r of Soc. Sec'y*, 683 F.3d 443, 448 (2d Cir. 2012) ("[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*" (citation and quotation marks omitted; emphasis in the original)); *accord Brown v. Colvin*, 73 F. Supp. 3d 193, 198-99 (S.D.N.Y. 2014).

Where the ALJ fails to provide an adequate roadmap for his reasoning, remand is appropriate. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) ("the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence."). Where the ALJ adequately explains his reasoning, however, and where his conclusion is supported by substantial evidence, the district

court may not reverse or remand simply because it would have come to a different decision on a *de novo* review. *See Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("the court should not substitute its judgment for that of the Commissioner"); *Ryan v. Astrue*, 5 F. Supp. 3d 493, 502 (S.D.N.Y. 2014) ("this Court may not substitute its own judgment as to the facts, even if a different result could have been justifiably reached upon *de novo* review") (quoting *Beres v. Chater*, 1996 WL 1088924 at \*5 (E.D.N.Y. May 22, 1996)); *Cleveland v. Apfel*, 99 F. Supp. 2d 374, 379 (S.D.N.Y. 2000) ("This Court may not substitute its own judgment for that of the ALJ, even if it might have reached a different result upon a de novo review.").

## B. The Treating Physician Rule

The treating physician rule requires the ALJ to give controlling weight to the opinion of a claimant's treating physician so long as that opinion is well-supported by medical findings and is not inconsistent with other evidence in the record. 20 C.F.R. § 416.927(c)(2). The rule recognizes that treating physicians are "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(c)(2). *See also Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient.").

Where mental health treatment is at issue, the treating physician rule takes on added importance. *Rodriguez v. Astrue*, 2009 WL 637154, at \*26 (S.D.N.Y. Mar. 9, 2009). "A mental health patient may have good days and bad days; [he] may respond to different stressors that are not always active. Thus, the longitudinal relationship between a mental health patient and [his]

24

treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination." *Bodden v. Colvin*, 2015 WL 8757129, at \*9 (S.D.N.Y. Dec. 14, 2015). *See also Richardson v. Astrue*, 2009 WL 4793994, at \*7 (S.D.N.Y. Dec. 14, 2009) ("Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health.") (internal citations and quotation marks omitted).

In this Circuit, the treating physician rule is robust, but not unassailable.

> Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must apply various factors to determine the amount of weight the opinion should be given. These factors include: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion.

*Norman v. Astrue*, 912 F. Supp. 2d 33, 73 (S.D.N.Y. 2012). *See also* 20 C.F.R. §416.927(c)(2) (listing factors). Assuming a sufficiently lengthy doctor-patient relationship with adequate opportunities for examination, the ALJ can discount the treating physician's opinion only if the ALJ believes that it "lack[s] support or [is] internally inconsistent." *Duncan v. Astrue*, 2011 WL 1748549, at \*19 (E.D.N.Y. May 6, 2011). *Accord Lacava*, 2012 WL 6621731, at \*12.

"When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). If the ALJ does not afford controlling weight to the opinion of the treating physician, the ALJ must provide "good reasons" for that decision. *Halloran*, 362 F.3d at 32-33 (citing *Schaal*, 134 F.3d at 505) (internal quotation marks omitted). *See also* 20 C.F.R. § 416.927(c)(2) (the Commissioner "will always give good reasons in our . . . decision for the weight we give

25

your treating source's opinion"). An ALJ who fails to explain why he discounted the treating physician's opinion deprives the court of the ability to determine accurately whether his conclusion is supported by substantial evidence; in these cases, remand is appropriate. *Snell*, 177 F.3d at 134; *Ferraris*, 728 F.2d at 587.

## C. The ALJ Adequately Explained His Decision to Discount the Treating Physician's Opinion

Here, the ALJ gave Dr. Lubrano's opinion "little weight" at steps three and four. (R. 20.) As the ALJ noted, Dr. Lubrano opined that Mendez had "moderate to extreme limitations in mental work-related activities," and concluded that he is unable to work. (R. 20.)[8] However, the ALJ explained, "the treating source notes do not show the level of symptoms reported in [Dr. Lubrano's] reports." (R. 20.) As the ALJ pointed out, many of Dr. Lubrano's treatment notes stated that Mendez was stable on his medication and that his symptoms were improving. *Id.* (*See also* R. 442, 447, 450.) Indeed, on October 10, 2013, the day Dr. Lubrano opined that Mendez showed a "poor response to medication" (R. 413), his treatment notes reported "moderate improvement" in response to medication. (R. 447.) Neither stability nor improvement, of course, necessarily means that the claimant is capable of working. Any significant inconsistency between the opinion and the underlying treatment notes, however, gives the ALJ a reason to discount the opinion more generally. Here, there are several such inconsistencies. For example, Dr. Lubrano's November 19, 2013 report stated that Mendez displayed "poor hygiene and grooming," "inappropriate laughing," "racing thoughts," "elated" mood and "inappropriate"

---

[8] Consultative examiner Dr. Dubro, using the same form, opined that Mendez had "mild" to "marked" limitations in this area. (R. 436.) Medical expert Dr. Halperin did not provide a precise opinion as to the degree of plaintiff's limitation, but he did testify, under questioning from the ALJ, that Mendez could "concentrate and keep a regular schedule and show up five days a week . . . on a basic, unskilled job." (R. 34.) The ALJ ultimately found that plaintiff had "moderate" difficulties regarding concentration, persistence or pace. (R. 17.)

affect, and was "disoriented to day." (R. 420-21.) His treatment notes from the same day reported that the same patient was "[o]riented x3, pleasant, cooperative and well-related." (R. 450.) The ALJ also noted that plaintiff's medication dosage "has remained unchanged for a long period of time" (R. 20), which is arguably inconsistent with Dr. Lubrano's opinion that Mendez showed a "poor response" to that dosage.

The ALJ did not explicitly address all of the factors listed in 20 C.F.R. § 416.927(c)(2) and discussed in *Norman*, 912 F. Supp. 2d at 73. He did not, for example, discuss the "length of the treatment relationship and the frequency of examination," the "nature and extent of the treatment relationship," or the "physician's level of specialization in the area." *Id.* It is clear from the record, however, that the ALJ was aware that Dr. Lubrano was a psychiatrist (and therefore a specialist) and that he reviewed all of the treatment records from La Casa de Salud, covering more than three years of treatment. (R. 19-20.) Similarly, the ALJ did not expressly analyze the extent to which Dr. Lubrano's opinion was consistent or inconsistent with each other item of evidence in the record. He did, however, summarize much of that evidence at step four, including the opinions of consultative examiners Dr. Broska and Dr. Dubro and plaintiff's hearing testimony. *Id.*

A detailed discussion of each *Norman* factor is not required, so long as the ALJ provides "'good reasons' for the weight she gives to the treating source's opinion." *Halloran*, 362 F.3d at 32-33 (quoting *Schaal*, 134 F.3d at 505). *See also Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."); *Gabrielsen v. Colvin*, 2015 WL 4597548, at *8 (S.D.N.Y. July 30, 2015) ("a recitation of every factor of the treating physician rule is unnecessary; the ALJ need not explicitly consider each factor of the treating physician rule, but

27

rather must only follow its mandate more generally"). I therefore conclude that the ALJ has provided an adequate roadmap for his decision to discount the opinion of Dr. Lubrano.

I also conclude that the ALJ was not required to re-contact Dr. Lubrano for an explanation of the inconsistencies he discussed. "To the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013) (quoting *Burgess*, 537 F.3d at 129). In some cases, "the nature of the record may render re-contacting the treating physician the best, if not the only, way to address gaps or inconsistencies in the record, such that it is incumbent upon the ALJ to do so." *Gabrielsen*, 2015 WL 4597548, at *6.

In *Gabrielsen*, the court remanded the case to the agency for this purpose after the ALJ determined that the opinion of the treating physician, Dr. Johnson, was inconsistent with her own treatment notes and with plaintiff's statements regarding his mental functioning. *Id.* at *7. The court noted that "at least some of the deficiencies that the ALJ points out, namely apparent inconsistencies between Dr. Johnson's own notes and her reports and a failure to 'document the signs and symptoms' in treatment logs, are precisely the types of inconsistencies that Dr. Johnson would best be able to resolve." *Id.* Here, however, the ALJ had access to what appears to be a complete set of Dr. Lubrano's treatment notes, from February 15, 2011 (R. 343) through June 2, 2014 (R. 453), just a month before he issued his opinion. The inconsistencies do not arise from gaps in the record, nor from any failure by the treating physician to document plaintiff's symptoms. Rather, the symptoms that were documented were inconsistent with the opinion of the physician who documented them. Dr. Lubrano's opinion was also inconsistent, in certain respects, with the clinical findings and resulting opinions of Dr. Broska and Dr. Dubro, both of

whom examined plaintiff personally. Dr. Broska found plaintiff's thought processes "[c]oherent and goal-directed," his affect "appropriate," and his attention and concentration "intact," though she estimated his intellectual functioning as "below average" and found his judgment and insight to be "poor." (R. 369-70.) Even Dr. Dubro, who characterized plaintiff's thought processes as "relatively circumstantial and tangential" and noted that his attention and concentration were "impaired" (R. 425-26), reported only "mild" difficulty in plaintiff's ability to understand, remember and carry out simple instructions, and "moderate" difficulty in his ability to make judgments on simple work-related decisions. (R. 436.)[9]

Moreover, the ALJ did take steps to expand the record. He directed additional consultative examinations between the first and the second hearings, including – for the first time – an I.Q. test. (R. 52-53.) The ALJ then accepted Dr. Dubro's diagnoses, including bipolar disorder and borderline intelligence, which he listed as "severe impairments" (R. 16) and relied on them, in part, to conclude that plaintiff's functional capacity was limited to jobs involving simple tasks with at most occasional contact with supervisors, coworkers, and the public. (R. 18.)

Under these circumstances the ALJ was not required to seek additional information from Dr. Lubrano before analyzing the information he had. Nor, on the record in this case, was he required to give controlling weight to Dr. Lubrano's opinion. ALJ Grossman "articulated specific reasons" why that opinion was "both internally inconsistent and unsupported by the medical evidence, while providing specific examples of both. This is sufficient to satisfy the 'good reasons' requirement." *Heitz v. Comm'r of Soc. Sec'y*, 2016 WL 4384350, at *7 (S.D.N.Y. Aug. 17, 2016). *See also Halloran*, 362 F.3d at 32 ("the opinion of the treating physician is not

---

[9] Plaintiff argues that Dr. Lubrano's opinion was "fully supported" by Dr. Dubro. Pl. Mem. of Law at 4. In fact, although both experts filled out the same form, they disagreed as to the severity of plaintiff's limitation in almost every relevant category, with Dr. Lubrano consistently finding a more severe degree of limitation. *Compare* R. 416-17 (Lubrano) *with* R. 436-37 (Dubro).

29

afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts"). Moreover, having "found a lack of evidence to support [the treating physician's] assessment, the ALJ was entitled to rely on statements by other physicians in the record." *Legg v. Colvin*, 574 F. App'x 48, 49 (2d Cir. 2014) (summary order).

## D. The ALJ's Determination Is Supported by Substantial Evidence

Mendez argues that "[a]ll of the medical opinions support a finding that plaintiff does not have the capacity to perform full time work." Pl. Mem. of Law at 9. He then highlights the *portions* of those medical opinions that would indeed support such a finding. *Id.* The question for this Court, however, is not whether the ALJ could have found Mendez disabled; it is whether a reasonable factfinder would be *required* to do so. *Brault*, 683 F.3d at 448. It is "a very deferential standard of review – even more so than the 'clearly erroneous' standard." *Id. See also Brown*, 73 F. Supp. 3d at 198-99; *Ryan*, 5 F. Supp. 3d at 502.

Applying that "very deferential" standard, I cannot conclude that a reasonable factfinder would be required to award SSI benefits to Mendez. All of the medical experts observed, and plaintiff confirmed, that he lives alone, shops, cooks, and cleans for himself, travels independently on public transportation (keeping every appointment in the record except for the second ALJ hearing), and complies with his treatment. Dr. Broska, as noted above, found plaintiff's thought processes "[c]oherent and goal-directed," his affect "appropriate," and his attention and concentration "intact." (R. 369-70.) Athough she estimated his intellectual functioning as "below average" and found his judgment and insight to be "poor" (R. 370), she concluded that he could "follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, [and] learn new tasks." (R. 370.) She added that Mendez "can relate adequately with others and

appropriately deal with some stress." *Id.* Dr. Dubro provided a more guarded outlook, but noted only "mild" to "moderate" restrictions on plaintiff's ability to handle simple work-related instructions and decisions. (R. 436.) Dr. Halperin, after reviewing the record, opined that plaintiff's concentration issues are "not at a level that would preclude his working at a simple task or perhaps even a more complicated task" (R. 33), and that he would have only a "slight" problem getting along with people in a job. (R. 34.)

I am somewhat troubled by the ALJ's recitation of plaintiff's supposed testimony "that he has a GED." (R. 20.) In fact, Plaintiff testified that he got to 10th grade in school, that he "took" the GED, and that he "passed three tests." (R. 48-49.) He never testified that he obtained his GED, and there is no evidence of such an achievement in the record. However, the jobs that the ALJ found he could perform – maintenance worker, kitchen helper, park worker – do not require a GED. It is undisputed that Mendez can read at a sixth-grade level, which according to Dr. Halperin is "perfectly literate in terms of filling out job applications." (R. 33.)[10]

## VI.   CONCLUSION

For the reasons set forth above, I conclude that ALJ did not err in determining that plaintiff was not disabled within the meaning of the Act. I therefore recommend, respectfully, that the Commissioner's motion for judgment on the pleadings be GRANTED and that plaintiff's motion for judgment on the pleadings be DENIED.

---

[10] Another factfinder might also have discounted plaintiff's testimony that he "thinks he is able to work," as well as the evidence that he "was seeking a commercial driver's license." (R. 20.) Given that plaintiff's impairments include schizoaffective disorder (R. 16), he may be an unreliable reporter concerning his own abilities. *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 105 (5th ed. 2013) (diagnostic criteria for schizoaffective disorders include "[d]elusions or hallucinations for 2 or more weeks"). It for the ALJ, however, not the reviewing court, to resolve evidentiary conflicts and determine credibility issues. *Yancey,* 145 F.3d at 111.

## NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Vernon S. Broderick at 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned magistrate judge. Any request for an extension of time to file objections must be directed to Judge Broderick. Failure to file timely objections will preclude appellate review. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

Dated: New York, New York
February 27, 2017

**SO ORDERED.**

**BARBARA MOSES**
**United States Magistrate Judge**

32